An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the *North Carolina Rules of Appellate Procedure*.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-741

Filed 15 April 2026

Onslow County, Nos. 22JT000116-660, 24JT000001-660

IN THE MATTER OF: R.Z.H., R.L.H.

Appeal by Respondents from orders entered 14 May 2025 by Judge Mario M. White in Onslow County District Court. Heard in the Court of Appeals 11 March 2026.

> *Jeffrey L. Miller, for respondent-appellant father.*
>
> *Jack T. Brock II, for respondent-appellant mother.*
>
> *Richard A. Penley, for petitioner-appellee Onslow County Department of Social Services.*
>
> *Stephen M. Schoeberle, for appellee Guardian ad Litem.*

STADING, Judge.

Respondent-Father ("Father") and Respondent-Mother ("Mother"), together "Respondents," appeal from the trial court's orders terminating their parental rights to their children, Roy and Rachel.[1] On appeal, Respondents contend the trial court committed error by using insufficient evidence and findings of fact to reach the

---

[1] We use pseudonyms to protect the identity of minor children. See N.C. R. App. P. 42(b).

grounds to terminate their parental rights. Respondents also argue the trial court erred by failing to require the Guardian ad Litem ("GAL") to produce evidence of their children's best interests at the disposition hearing.

## I. Background

The record tends to show that Respondents are the biological parents of Roy, who was born in early 2022. Respondents provided sole care and supervision for Roy. Father, who is disabled and unable to work, provided sole supervision of Roy until Mother would finish working from home. After Mother finished work, Respondents supervised Roy together.

On 14 September 2022, Respondents brought Roy to Onslow Memorial Hospital after he had been crying and vomiting overnight. The hospital performed a CT scan on Roy, which showed a subdural hematoma. Roy was transferred to the ECU Health Medical Center in Greenville. A subsequent CT scan was performed, which showed an acute subdural hemorrhage, a chronic subdural hemorrhage, and a diffused bilateral retinal hemorrhage. That same day, the Onslow County Department of Social Services ("DSS") received a report of neglect and improper supervision of Roy. Respondents claimed Roy had fallen off a bed and onto a return register on the floor.

On 16 September 2022, DSS filed a juvenile petition alleging the abuse and neglect of Roy. Attached to the petition, DSS noted that diffused bilateral retinal hemorrhaging is indicative of Shaken Baby Syndrome. The petition further alleged

Roy experienced two acute injuries, one of which could not have resulted from a fall from a bed, and the other was unlikely to have resulted from this fall in the context of bilateral retinal hemorrhaging. Roy's chronic subdural hemorrhage was estimated to be at least a week old. DSS received no reasonable explanation for the cause of the injuries to Roy. Respondents alleged the maternal grandmother was responsible, however, Respondents provided no instance of the maternal grandmother supervising Roy during the time leading to Roy's injuries. DSS further noted its substance abuse concerns with Respondents. ECU Health Medical Center staff reported that Respondents would leave for long periods of time, and upon their return, they would fall asleep shortly afterward. The staff also observed that Mother's speech was slurred and she was unable to communicate. That same day, the trial court entered an order placing Roy in the nonsecure custody of DSS.

On 29 September 2022, Respondents entered into a Family Service Agreement with DSS. Respondents agreed to complete a substance abuse assessment, domestic violence assessment, submit to random drug screen requests, and participate in substance abuse recovery and nurturing (SARN) and anger management classes at "PEERS" Family Development Center.

On 12 December 2023, the trial court entered an order adjudicating Roy neglected within the meaning of N.C. Gen. Stat. § 7B-101(15), but concluding Roy was not an abused juvenile. Then, in late 2023, Mother gave birth to Rachel. On 3 January 2024, DSS filed a juvenile petition, alleging Rachel was a neglected juvenile

since Respondents "create[] or allows to be created a living environment that is injurious to the juvenile's welfare." The petition also included an attachment describing Respondents' failure to adhere to an order entered on 12 December 2023, and their failure to "adequately address their substance abuse, mental health, and domestic violence needs." On 3 January 2024, the trial court entered a nonsecure custody order for Rachel to be placed with DSS.

On 19 February 2024, the trial court entered an order for the adjudication and disposition of Roy. The trial court's findings showed: (1) that the injuries sustained by Roy resulted in continued "developmental delays and lasting damage"; (2) that Roy requires care for "neurological needs, ophthalmological needs, physical therapy, occupational therapy, and speech therapy"; (3) that Roy is "unable to walk without assistance"; (4) although his hearing is normal, "the damage to [Roy's] brain has made him unable to process sounds"; and (5) that as a result, Respondents had multiple criminal charges pending at the time of the hearing. The trial court found Roy's injuries were "caused by other than accidental means," and returning Roy to Respondents would be contrary to his health and safety. The trial court adjudicated Roy neglected, in that Respondents "did not provide proper care, supervision, or discipline to [Roy]," and "created or allowed to be created a living environment that is injurious to [Roy's] welfare[.]" The trial court incorporated Respondents' case plan into its order and granted custody of Roy to DSS with full placement authority.

On 18 March 2024, the trial court entered a permanency planning order regarding Roy. The trial court found it would be in the best interests of Roy to order DSS to maintain custody of him with full placement authority. On 22 May 2024, a disposition hearing was held for Rachel, where DSS was granted custody with full placement authority.

On 23 May 2024, the trial court entered a juvenile adjudication order for Rachel after a hearing on 25 April 2024. Regarding Mother's compliance with the September 2022 Family Service Agreement, the trial court found: (1) she had not engaged in the SARN parenting class at "PEERS"; (2) she "had begun, but not completed the anger management parenting class at PEERS"; (3) she had "failed or refused to sign releases" for DSS to verify her attendance to "PORT"; (4) she had missed five appointments to obtain a domestic violence assessment; and (5) she tested positive for marijuana on 22 August 2023. Regarding Father's compliance with the agreement, the trial court found: (1) he had completed a "substance abuse assessment, domestic violence assessment, and anger management parenting class at PEERS"; (2) he had not engaged in SARN parenting classes at "PEERS"; (3) he had consistently tested positive for marijuana during random drug screens; and (4) he had "failed or refused to address his mental health needs." The trial court found Respondents "had failed to acknowledge their roles in the injuries sustained by [Roy]" and "the conditions that led to the removal of [Roy] from the home of Respondents continued to be unresolved." Finding that Respondents "have created or allowed to

be created a living environment that is injurious to" Rachel's welfare, the trial court adjudicated Rachel neglected and granted DSS custody.

On 22 July 2024, the trial court entered a permanency planning order for Roy. The trial court found that "Respondents have not made adequate progress within a reasonable period of time under the plan," and that Respondents were "not actively participating in or cooperating with the plan." The trial court ordered reunification between Respondents and Roy to be removed from the case plan, and for DSS to maintain custody of Roy with full placement authority. Also on 22 July 2024, the trial court entered a juvenile disposition order for Rachel, after a hearing on 22 May 2024. The trial court granted custody of Rachel to DSS with full placement authority.

On 9 September 2024, DSS filed a termination of parental rights ("TPR") petition regarding Roy. On 31 October 2024, the trial court entered a permanency planning order regarding Rachel, after a hearing on 2 October 2024. The trial court ordered reunification between Respondents and Rachel to be removed from the case plan, and that DSS maintain custody of Rachel with full placement authority. On 20 December 2024, DSS filed a TPR petition regarding Rachel. On 29 January 2025, the trial court entered a permanency planning order regarding Roy. The trial court ordered Respondents' visitation with Roy to cease, and that DSS maintain custody of Roy with full placement authority.

On 4 April 2025, the trial court held hearings on the petitions to terminate Respondents' parental rights. For each hearing, the trial court took judicial notice of

the juvenile court record and heard additional testimony from social work supervisor Duchelot Pierre. At each juvenile's adjudicatory phase, the trial court concluded sufficient conditions and grounds authorizing the termination of parental rights of Respondents with respect to Roy and Rachel existed pursuant to section 7B-1111(a).

For Rachel, the trial court adjudicated the existence of four grounds to terminate respondents' parental rights. First, abuse or neglect under N.C. Gen. Stat. § 7B-1111(a)(1) (2025). Second, that Respondents are "incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that the incapability will continue for the foreseeable future." N.C. Gen. Stat. § 7B-1111(a)(6). Third, that Respondents have "willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition . . . ." N.C. Gen. Stat. § 7B-1111(a)(7). Fourth, that Respondents have "committed a felony assault that results in serious bodily injury to" their other child, Roy. N.C. Gen. Stat. § 7B-1111(a)(8).

For Roy, the trial court adjudicated the existence of five grounds to terminate respondents' parental rights. In addition to the four grounds reached in Rachel's order, Roy's order also found that Respondents have "willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has

been made in correcting those conditions which led to the removal of the juvenile." N.C. Gen. Stat. § 7B-1111(a)(2).

At each juvenile's dispositional phase, the trial court concluded that termination of Respondents' parental rights was in their best interests. On 13 May 2025, the trial court entered its order terminating the parental rights of Respondents to Rachel. The next day, the trial court entered an order terminating the parental rights of Respondents to Roy. Respondents timely appealed.

## II. Analysis

Respondents contend the evidence and findings of fact are insufficient to support the trial court's conclusion for the existence of any ground to terminate their parental rights because the trial court impermissibly judicially noticed prior orders. Respondents also contend the trial court abused its discretion in concluding that it was in the best interests of the juveniles to terminate their parental rights.

### A. Findings of Fact as Conclusions of Law

We first address Father's argument that "Findings 36, 37, 39, 41–46 in Roy's termination Order, and Findings 31, 32, 33, 34, 36–40 in Rachel's termination Order are actually conclusions of law."

"[A]ny determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law," and any determination reached through "logical reasoning from the evidentiary facts" should be classified as a finding of fact. *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672,

675 (1997) (citations omitted). And, "[u]ltimate facts are the final resulting effect reached by processes of logical reasoning from the evidentiary facts." *In re Anderson*, 151 N.C. App. 94, 94, 564 S.E.2d 599, 600 (2002). "The trial court's classification of its own determination as a finding or conclusion does not govern our analysis." *In re J.T.C.*, 273 N.C. App. 66, 73, 847 S.E.2d 452, 458 (2020).

To the extent that Father is correct, in our analysis below, we will treat those mislabeled findings of fact as conclusions of law. We thus proceed with our review of the termination order "to determine whether the trial court made sufficient factual findings to support its ultimate findings of fact and conclusions of law, regardless of how they are classified in the order." *In re Z.A.M.*, 374 N.C. 88, 97, 839 S.E.2d 792, 798 (2020).

## B. Findings of Fact

Our appellate courts review "trial court orders in cases in which a party seeks to have a parent's parental rights in a child terminated by determining whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings support the trial court's conclusions of law." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *Id.* "Unchallenged findings of fact are deemed supported by competent evidence and are binding on appeal." *In re J.D.O.*, 381 N.C. 799, 805, 874 S.E.2d 507, 514 (2022) (citation omitted).

Moreover, "we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58–59 (2019).

## 1. Judicial Notice

Respondents argue the trial court erred by relying solely on the judicially noticed record when sufficient corroborating evidence at the hearings was required. Together, Respondents challenge Findings of Fact Nos. 13–19 and 20–22 in the TPR order addressing Rachel, and Findings of Fact Nos. 12–27 in the TPR order addressing Roy. Respondents contend these findings are insufficiently supported by clear, cogent, and convincing evidence since they rely solely on judicial notice without support from oral testimony.

"Evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights," but "the trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (citation modified). "The key to a valid termination of parental rights on neglect grounds where a prior adjudication of neglect is considered is that the court must make an *independent* determination of whether neglect authorizing the termination of parental rights existed at the time of the hearing." *In re A.M.*, 192 N.C. App. 538, 541–42, 665 S.E.2d 534, 536 (2008) (citations omitted). While "some oral testimony"

is needed, trial courts may "continue to rely upon properly admitted reports or other documentary evidence and prior orders, as long as a witness or witnesses are sworn or affirmed and tendered to give testimony." *Id.* at 542, 665 S.E.2d at 536.

For both orders, the trial court took judicial notice of the underlying case files. With respect to the TPR order addressing Rachel, the trial court took judicial notice of Roy's 19 February 2024 adjudication and disposition order, which adjudicated Roy neglected. Rachel was also adjudicated neglected on 23 May 2024. Since Respondents did not appeal from either juveniles' adjudication order, the doctrine of collateral estoppel prevents Respondents from re-litigating these findings of fact. *See In re T.N.H.*, 372 N.C. at 409, 831 S.E.2d at 60. Therefore, having found past neglect, the trial court was tasked with hearing evidence to make an independent determination "of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232.

During both juveniles' TPR hearings, the trial court heard current evidence from Mr. Pierre of Respondents' "probability of a repetition of neglect." *In re M.A.*, 378 N.C. 462, 466, 862 S.E.2d 169, 173 (2021) (citation omitted). In both hearings, Mr. Pierre provided testimony concerning Respondents' "sporadic" compliance with drug screens. *See In re J.D.O.*, 381 N.C. at 820, 874 S.E.2d at 523 (holding the respondent's continued substance abuse and refusal to comply with her case plan supported the trial court's 7B-1111(a)(1) conclusion of the likelihood of future

neglect). Mr. Pierre testified to Respondents missing multiple scheduled appointments and to their failure to seek treatment. *See In re M.A.*, 378 N.C. at 476, 862 S.E.2d at 179 (citation omitted) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect."). Mr. Pierre's testimony highlighted Respondents' lack of visits. *See In re D.L.A.D.*, 375 N.C. 565, 572, 849 S.E.2d 811, 817 (2020) ("An extended period in which a parent does not attempt to visit the child could show ['a future propensity to be inattentive to the child.']"); *see also In re T.B.*, 380 N.C. 807, 818, 870 S.E.2d 119, 126 (2022) (citation omitted) ("We have recognized a parent's 'pattern of inconsistent contact and lack of interest' in a child as indicative of a likelihood of future neglect for purposes of N.C.G.S. § 7B-1111(a)(1)."). Further, Mr. Pierre testified Respondents had not provided an explanation for the injuries sustained by Roy in September 2022. *See In re Y.Y.E.T.*, 205 N.C. App. 120, 129, 695 S.E.2d 517, 523 (2010) ("Furthermore, Respondents' refusal to accept responsibility for the child's injury indicates that the conditions which led to the child's initial removal from Respondents' home have not been corrected.").

For these reasons, Mr. Pierre's testimony was "in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232. Therefore, the challenged findings of fact "appear to be based, at least in part, on testimony provided at the hearing, sufficient to demonstrate that the trial court made an independent determination regarding the evidence presented."

*In re T.N.H.*, 372 N.C. at 410, 831 S.E.2d at 60–61. Thus, the trial court did not err in its findings with respect to taking judicial notice of the juveniles' case file.

### 2. *Findings of Fact Nos. 33 & 38*

Mother challenges Finding of Fact No. 33 in the TPR order addressing Rachel, and its analogue, Finding of Fact No. 38 in the TPR order addressing Roy, which provides:

> That Respondent [Mother] and Respondent [Father] have not completed nor attempted to complete their case plans, nor has either Respondent made efforts to be reunified with the juvenile."

Respondents' case plans were adopted and incorporated into multiple prior orders made by the trial court, including Roy's prior dispositional order. There, Respondents were ordered to (1) "participate in Stress and Anger Management and Stepping Stones-Triple P parenting classes through PEERS, and that each shall demonstrate the skills learned therefrom"; (2) "complete a full-scale psychological evaluation with a parental capacity component with a provider of his and/or her choice, and that each shall follow all recommendations resulting therefrom"; (3) "submit to random drug screens as requested by the Department within four (4) hours of such request." Additionally, Mother was ordered to "complete a domestic violence assessment with a provider of her choice," and complete a substance abuse assessment with a provider of her choice."

After reviewing testimony from Mr. Pierre, the trial court was able to make a proper "independent determination" that the case plan was not followed by either Respondent. *In re T.N.H.*, 372 N.C. at 410, 831 S.E.2d at 60. The trial court adopted Respondents' case plan in prior court orders, and the trial court took judicial notice of those orders. *See In re B.O.A.*, 372 N.C. at 385, 831 S.E.2d at 314. Contrary to Mother's argument, we hold these findings are supported by clear, cogent, and convincing evidence.

## C. Termination Ground—Neglect

Respondents assert the trial court erred by terminating their parental rights on the ground of neglect. Specifically, Father argues the evidence and findings of fact do not support the trial court's conclusion of law that he "caused the juveniles to be abused or neglected." Mother also argues DSS failed to establish neglect because Respondents did not have custody of either juvenile on the date of the TPR petition. Since we have already concluded the sufficiency of these findings in section A of this opinion, our determination turns to whether the trial court adequately concluded the likelihood of future neglect for Roy and Rachel.

"We review a trial court's adjudication under N.C. [Gen. Stat.] § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.,* 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (citation omitted). "Conclusions of law made by the trial court are reviewable de novo on appeal." *In re K.S.*, 380 N.C. 60, 64, 868

S.E.2d 1, 4 (2022). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court." *In re Z.G.J.*, 378 N.C. 500, 520, 862 S.E.2d 180, 194 (2021) (citation omitted). Further, only one ground enumerated in N.C. Gen. Stat. § 7B-1111(a) is required to uphold a trial court's termination order. *See In re B.O.A.*, 372 N.C. at 380, 831 S.E.2d at 311 (citation modified) ("A finding by the trial court that any one of the grounds for termination enumerated in N.C.G.S. § 7B-1111(a) exists is sufficient to support a termination order.").

Pursuant to subsection 7B-1111(a)(1), the trial court may terminate parental rights if "the parent has . . . neglected the juvenile." N.C. Gen. Stat. § 7B-1111(a)(1) (citation modified). A neglected juvenile is defined as the following:

> Any juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does any of the following:
>
> a. Does not provide proper care, supervision, or discipline.
>
> b. Has abandoned the juvenile, except where that juvenile is a safely surrendered infant as defined in this Subchapter.
>
> c. Has not provided or arranged for the provision of necessary medical or remedial care.
>
> d. Or whose parent, guardian, or custodian has refused to follow the recommendations of the Juvenile and Family Team made pursuant to Article 27A of this Chapter.
>
> e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.
>
> f. Has participated or attempted to participate in the

- 15 -

unlawful transfer of custody of the juvenile under G.S.14-321.2.

g. Has placed the juvenile for care or adoption in violation of law.

N.C. Gen. Stat. § 7B-101(15) (2025).

"A finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." *In re Young*, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997). However, "if the child has been separated from the parent for a long period of time, there must be a showing of . . . a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841, 851 S.E.2d 17, 20 (2020) (citations omitted). "When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *Id.* (citations omitted). Additionally, "a trial court may consider 'whether the parent has made any meaningful progress in eliminating the conditions that led to the removal of the children.'" *In re M.B.*, 382 N.C. 82, 86, 876 S.E.2d 260, 265 (2022) (citation omitted).

Here, the trial court concluded grounds existed to terminate Respondents' parental rights for neglect based on its determination that Roy and Rachel were previously adjudicated neglected juveniles, and there was a strong probability that such neglect would be repeated in the future if Roy and Rachel were returned to Respondents' care. The trial court ultimately found Respondents will likely neglect

Roy and Rachel based on their: lack of efforts to reconnect with the juveniles; failure to complete or attempt to complete their case plans; and failure to comply with existing orders of the trial court.

For Roy, the trial court found:

> 12. That on September 14th, 2022, Respondents brought the juvenile to Onslow Memorial Hospital because he started crying and vomiting overnight.
>
> 13. That prior to taking the juvenile to Onslow Memorial Hospital, Respondents reported the juvenile had fallen off the bed and onto a return register on the floor; that Respondents claimed to be out of the room at the time this occurred; that Emergency Medical Services responded and observed no symptoms; and that Respondents declined to take the juvenile to the Emergency room at that time.
>
> 14. That a CT scan at Onslow Memorial Hospital indicated that the juvenile had a subdural hematoma. The juvenile was subsequently transferred to ECU Health Medical Center in Greenville, North Carolina.
>
> 15. That on September 14th, 2022, another CT scan was performed at ECU Health Medical Center in Greenville, North Carolina; repeat CT imaging demonstrated both acute, or new, subdural hemorrhages and a chronic, or old, subdural hemorrhage, and diffuse bilateral retinal hemorrhaging. Diffuse bilateral retinal hemorrhaging is indicative of Shaken Baby Syndrome.
>
> 16. That three total injuries were identified, including two acute injuries and one chronic injury; one acute injury could not be caused by a fall from a bed; the second acute injury is also unlikely to have resulted from a fall from a bed in the context of bilateral retinal hemorrhaging; and the other injury is estimated to be at lease one (1) week old.
>
> 17. That Respondents indicated that they believed the maternal grandmother, [ ], was responsible, but

Respondents were unable to provide instances when the maternal grandmother was supervising the juvenile that coincided with the occurrence of injuries. Respondents have not allowed [the maternal grandmother] to provide care for the juvenile.

18. That prior to the time the juvenile sustained the aforesaid injuries, the juvenile was not engaged in daycare; Respondent mother worked from home, and when she was working, the juvenile was supervised in the home by Respondent father; that Respondent father was disabled and unable to work; and that when Respondent mother was not working, both Respondents supervised the juvenile in the home.

19. That staff at ECU Health Medical Center observed Respondents to leave for long periods of time, and when they returned, Respondent mother slurred her speech and was unable to communicate; that both Respondents fell asleep shortly afterward; and that concerns for substance abuse of Respondents existed while the juvenile was in Respondents' care.

20. That the juvenile was in the sole care of Respondents at the times the juvenile sustained the foregoing serious physical injuries.

21. That Respondent [Mother] has not, to date, provided any reasonable, accidental, explanation for the cause of the injuries sustained by the juvenile [Roy].

22. That Respondent [Father] has not, to date, provided any reasonable, accidental, explanation for the cause of the injuries sustained by the juvenile [Roy].

23. That Respondent [Mother] was arrested and charged in Onslow County File Number 22–CR–311129–660 with two counts of felonious intentional child abuse causing serious bodily injury pursuant to N.C.G.S. §14–318.4 (A3), one count of felonious neglect child abuse causing serious bodily injury pursuant to N.C.G.S. §14–318.4 (A4), one count of misdemeanor assault on a child under 12, and once

count of misdemeanor contributing to the delinquency of a juvenile.

24. That Respondent [Mother] remains criminally charged at this time, and that there is no information as to when, if, or how, said charges may be resolved.

25. That Respondent [Father] was arrested and charged in Onslow County File Number 22–CR–311137–660 with one count of felonious negligent child abuse causing serious bodily injury pursuant to N.C.G.S. §14–318.4 (A4) and one count of misdemeanor contributing to the delinquency of a juvenile, and that said Respondent was also charged in Onslow County File Number 22–CRS–313739–660 with two counts of felonious intentional child abuse causing serious bodily injury pursuant to N.C.G.S. §14–318.4 (A3) and one count of misdemeanor assault on a child under 12 pursuant to N.C.G.S. §14–33(C) (3).

26. That Respondent [Father] remains criminally charged at this time, and that there is no information as to when, if, or how, said charges may be resolved.

27. That the Court adjudicated the juvenile to be neglected on December 12th, 2023, as set forth in the February 19th, 2024, Juvenile Adjudication and Disposition Order in Onslow County File Number 22–JA–116/22–JA–000116–660.

28. That Respondents visited with the juvenile on March 28th, 2024, but left said visitation prior to completing its duration; that Respondents visited with the juvenile in July, 2024; that Respondents visited with the juvenile in October, 2024; and that Respondents did not exercise any visitation with the juvenile since March, 2024, except as outlined above in this paragraph.

29. That neither Respondent [Father] nor Respondent [Mother] have completed the EC Nurturing parenting class.

30. That neither Respondent [Father] nor Respondent

[Mother] have completed a full-scale psychological evaluation.

31. That neither Respondent [Father] nor Respondent [Mother] have obtained any mental health treatment.

32. That neither Respondent [Father] nor Respondent [Mother] have completed any substance abuse treatment.

33. That Respondent [Father] and Respondent [Mother] have attended drug screen requests by the Petitioner sporadically, and that when attended, have been positive for marijuana.

34. That Respondent [Father] is disabled and unable to work; that Respondent [Mother] has stated that she is employed to the social worker, but has failed or refused to provide documentation to the social worker of the same such that her alleged employment cannot be verified.

35. That neither Respondent [Father] nor Respondent [Mother] have regularly sent the juvenile cards, gifts, supplies, or like items.

36. That Respondent [Mother] and Respondent [Father] have willfully neglected and refused to perform the natural and legal parental obligations of care and support for the juvenile.

37. That Respondent [Mother] and Respondent [Father] have withheld their presence, love, care, and opportunity to display filial affection.

38. That Respondent [Mother] and Respondent [Father] have not completed nor attempted to complete their case plans, nor had either Respondent made efforts to be reunified with the juvenile.

39. That Respondent [Mother] and Respondent [Father] have, through their actions and inactions, demonstrated and continue to demonstrate that they are unwilling and/or unable to provide for the care of this juvenile.

40. That there is a high likelihood of future neglect by Respondent [Mother] and Respondent [Father] in that both Respondents have abandoned the juvenile; both Respondents have made no efforts to reconnect or reunify with this juvenile; both Respondents have not completed nor attempted to complete their case plans; and both Respondents have not complied with existing Orders of the Court.

41. That pursuant to N.C.G.S. §7B–1111(a) (1), Respondent [Mother] and Respondent [Father] have caused the juvenile to be abused or neglected within the meaning of N.C.G.S. §7B–101. **{R p 278-281}**

Additionally, for Rachel, the trial court found:

12. That Respondents are also the parents of the juvenile [Roy], born January 21st, 2022.

13. That in Onslow County File Number 22–JA–116, the Onslow County Department of Social Services filed a Petition alleging the juvenile [Roy] to be an abused and neglected juvenile.

14. That on or about February 19th, 2024, the Court entered a Juvenile Adjudication and Disposition Order which, inter alia, adjudicated the juvenile [Roy] to be a neglected juvenile within the meaning of N.C.G.S. 7B–101(15) in that Respondents herein had not provided proper care, supervision, or discipline to said juvenile, and further adjudicated said juvenile to be a neglected juvenile within the meaning of N.C.G.S. 7B–101(15) in that Respondents herein created or allowed to be created a living environment that was injurious to the juvenile's welfare.

15. That the juvenile [Roy] was in the sole care of Respondents at the time said juvenile sustained the serious physical injuries . . . .

16. That as the result of the actions of Respondents with respect to the juvenile [Roy], Respondent mother was charged in Onslow County File Number 22–CR–311129–

- 21 -

660 with two felonious counts of child abuse pursuant to N.C.G.S. 14-318.4(A3), one count of felonious child abuse pursuant to N.C.G.S. 14-318.4(A4), one count of misdemeanor assault on a child under twelve (12), and one count of misdemeanor contributing to the delinquency of the minor. These charges remain pending at this time.

17. That as the result of the actions of Respondents with respect to the juvenile [Roy], Respondent father has been charged in Onslow County File Number 22–CR–311137–660 with one count of felonious child abuse pursuant to N.C.G.S. 14-318.4(A4) and one count of misdemeanor contributing to the delinquency of the minor, and in Onslow County File Number 22–CR–313739–660 (Now 22–CRS–313739–660) with two felonious counts of child abuse pursuant to N.C.G.S. 14-318.4(A3) and one count of misdemeanor assault on a child under twelve (12). These charges remain pending at this time.

18. That Respondent [Mother] has not, to date, provided any reasonable, accidental, explanation for the cause of the injuries sustained by the juvenile [Roy].

19. That Respondent [Father] has not, to date, provided any reasonable, accidental, explanation for the cause of the injuries sustained by the juvenile [Roy].

20. That Respondent [Mother] remains criminally charged at this time, and that there is no information as to when, if, or how, said charges may be resolved.

21. That Respondent [Father] remains criminally charged at this time, and that there is no information as to when, if, or how, said charges may be resolved.

22. That on or about May 23rd, 2024, this Court entered a Juvenile Adjudication Order in the underlying juvenile matter, being 24–JA–1/24–JA–000001–660, through which this Court adjudicated the juvenile to be a neglected juvenile.

23. That Respondents visited with the juvenile on March

28th, 2024, but left said visitation prior to completing its duration; that Respondents visited with the juvenile in July, 2024; that Respondents visited with the juvenile in October, 2024; and that Respondents did not exercise any visitation with the juvenile since March, 2024, except as outlined above in this paragraph.

24. That neither Respondent [Father] nor Respondent [Mother] have completed the EC Nurturing Parenting Class.

25. That neither Respondent [Father] nor Respondent [Mother] have completed a full-scale psychological evaluation.

26. That neither Respondent [Father] nor Respondent [Mother] have obtained any mental health treatment.

27. That neither Respondent [Father] nor Respondent [Mother] have competed any substance abuse treatment.

28. That Respondent [Father] and Respondent [Mother] have attended drug screen requests by the Petitioner sporadically, and that when attended, have been positive for marijuana.

29. That Respondent [Father] is disabled and unable to work; that Respondent [Mother] has stated that she is employed to the social worker, but has failed or refused to provide documentation to the social worker of the same such that her alleged employment cannot be verified.

30. That neither Respondent [Father] nor Respondent [Mother] have regularly sent the juvenile cards, gifts, supplies, or like items.

31. That Respondent [Mother] and Respondent [Father] have willfully neglected and refused to perform the natural and legal parental obligations of care and support for the juvenile.

32. That Respondent [Mother] and Respondent [Father]

have withheld their presence, love, care, and opportunity to display filial affection.

33. That Respondent [Mother] and Respondent [Father] have not completed nor attempted to complete their case plans, nor has either Respondent made efforts to be reunified with the juvenile.

34. That Respondent [Mother] and Respondent [Father] have, through their actions and inactions, demonstrated and continue to demonstrate that they are willing and/or unable to provide for the care of this juvenile.

35. That there is a high likelihood of future neglect by Respondent [Mother] and Respondent [Father] in that bother Respondents have abandoned the juvenile; both Respondents have made no efforts to reconnect or reunify with this juvenile; both Respondents have not completed nor attempted to complete their case plans; and both Respondents have not complied with existing Orders of the Court.

36. That pursuant to N.C.G.S. §7B–1111(a) (1), Respondent [Mother] and Respondent [Father] have caused the juvenile to be abused or neglected within the meaning of N.C.G.S. §7B–101.

Looking at the trial court's order, its findings provide substantial evidence that Respondents had previously neglected Roy, and that there is a probability of repetition of neglect if Roy and Rachel were returned to their care and custody. Indeed, Roy was adjudicated neglected after having been found suffering from subdural hematomas and diffused bilateral retinal hemorrhages while in Respondents' care. Consequently, Respondents were ordered to enroll and participate in stress and anger management; parenting classes; and "that each shall demonstrate the skills learned therefrom." Additionally, Respondents were ordered

to complete a full-scale psychological evaluation and follow recommendations resulting therefrom. To this point, the trial court found Respondents "have not completed nor attempted to complete their case plans, nor had either Respondent made efforts to be reunified with the juvenile." *See In re M.A.*, 378 N.C. at 476, 862 S.E.2d at 179 (citation omitted) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect.").

In a similar vein, the trial court's order adjudicated Rachel neglected "within the meaning of N.C.G.S. 7B-101(15) in that Respondents have created or allowed to be created a living environment that is injurious to the juvenile's welfare." The trial court found that "both Respondents have not completed nor attempted to complete their case plans; and both Respondents have not complied with existing Orders of the Court." *See In re J.D.O.*, 381 N.C. at 818–19, 874 S.E.2d at 522 (citation omitted) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect."). The trial court also found that Respondents have not "provided any reasonable, accidental, explanation for the cause of the injuries sustained by the juvenile [Roy]." *See In re K.S.*, 380 N.C. at 65, 868 S.E.2d at 4 (citation omitted) ("In neglect cases involving newborns, 'the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case.'"); *see also In re M.T.*, 285 N.C. App. 305, 354, 877 S.E.2d 732, 764 (2022) ("Similarly here, the trial court could rely on the prior abuse and neglect of Ken plus Mother's lack of

explanation for Ken's injuries and condition when he arrived at the hospital to determine Mark was also a neglected juvenile because of the likelihood of future neglect or abuse."). The trial court's findings were sufficient to show Respondents' failure to correct circumstances which led to the harm upon Rachel's older sibling, Roy. *See In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999).

Further, the circumstances of Roy's neglect adjudication were relevant to determining whether Rachel is a neglected juvenile. *See* N.C. Gen. Stat. § 7B-101(15) ("In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home."). To this point, the trial court's additional findings include: Respondents at the time of the termination hearing have not "provided any reasonable, accidental, explanation for the cause of the injuries sustained by [Roy]"; Respondents "have not completed nor attempted to complete their case plans, nor has either Respondent made efforts to be reunified with the juvenile"; Respondents "have, through their actions and inactions, demonstrated and continue to demonstrate that they are unwilling and/or unable to provide for the care of this juvenile." *See In re A.W.*, 377 N.C. 238, 248, 856 S.E.2d 841, 850 (2021); *see also In re A.B.*, 179 N.C. App. 605, 613, 635 S.E.2d 11, 17 (2006). Therefore, the findings surrounding Roy's neglect adjudication were not the sole basis for the trial court determining that Rachel was a neglected juvenile. *See In re J.A.M.*, 372 N.C. 1, 10, 822 S.E.2d 693, 699 (2019) ("Here, the prior orders entered into the

record were not the sole basis for the trial court's decision. Rather, the trial court also properly found 'the presence of other factors' indicating a present risk to J.A.M. when it reached its conclusion that J.A.M. was neglected as a matter of law."); *see also In re A.B.*, 179 N.C. App. at 613, 635 S.E.2d at 17 ("Amy was a minor child living in a home where serious physical abuse had occurred to another child, and that respondent-mother had not taken steps to comply with the trial court's orders regarding the older siblings already adjudicated neglected and abused.").

Additionally, the trial court's orders found "that Respondents did not exercise any visitation with the juvenile since March, 2024, except as outlined above in this paragraph." *See In re T.B.*, 380 N.C. at 818, 870 S.E.2d at 126 (citation omitted) ("We have recognized a parent's 'pattern of inconsistent contact and lack of interest' in a child as indicative of a likelihood of future neglect for purposes of N.C.G.S. § 7B-1111(a)(1)."). Taken together, the findings demonstrate that: Roy and Rachel were previously adjudicated neglected in the past; and, based on Respondent's failure to make progress to the vast majority of their case plan between Roy's adjudication and the time of the termination proceeding, that Roy and Rachel will likely be neglected by Respondents in the future. *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 264; *see also In re M.A.*, 374 N.C. 865, 870, 844 S.E.2d 916, 921 (2020); *see also In re A.B.*, 179 N.C. App. at 613, 635 S.E.2d at 17.

Finally, for both orders, Father contends the trial court erred by making a disjunctive contention and conclusion of law. Father notes that the juveniles were

not adjudicated abused, and that there was no evidence or findings to support a conclusion of abuse. However, Father's argument lacks merit.

Finding of Fact No. 41 in the TPR order addressing Roy, and Finding of Fact No. 36, its analogue in the TPR addressing Rachel, provide:

> That pursuant to N.C.G.S. §7B–1111(a) (1), Respondent [Mother] and Respondent [Father] have caused the juvenile to be *abused or neglected* within the meaning of N.C.G.S. §7B–101.

Conclusion of law No. 2 in both orders provides:

> That sufficient conditions and grounds authorizing the termination of parental rights of Respondent [Father], with respect to this juvenile [], exist pursuant to North Carolina General Statutes §7B–1111(a), and that the same have been proven by clear, cogent, and convincing evidence.

"The trial court must enter sufficient findings of fact and conclusions of law to reveal the reasoning which led to the court's ultimate decision." *In re W.K.*, 379 N.C. 331, 334, 864 S.E.2d 313, 316 (2021) (citation modified). However, a "trial court need not use 'magic words' in its findings of fact or conclusions of law, if the evidence and findings overall make the trial court's basis for its order clear." *In re B.C.T.*, 265 N.C. App. 176, 188, 828 S.E.2d 50, 58 (2019).

In *In re W.K.*, the trial court failed to "state in its 'CONCLUSIONS OF LAW' section of the termination order which subsection of N.C.G.S. § 7B-1111 it was relying upon when determining that grounds existed to terminate his parental rights." 379 N.C. at 334, 864 S.E.2d at 316. The respondent argued the trial court committed

prejudicial error since it failed to "articulate the specific statutory grounds supporting termination." *Id.* Our Supreme Court held any potential error was harmless since the findings "clearly reveal the trial court's reasoning which led to its ultimate determination to terminate respondent's parental rights for neglect under N.C.G.S. § 7B-1111(a)(1)." *Id.* at 335, 864 S.E.2d at 316.

Here, both orders contain findings of the likelihood of neglect, including:

> That there is a high likelihood of future neglect by Respondent [Mother] and Respondent [Father] in that both Respondents have abandoned the juvenile; both Respondents have made no efforts to reconnect or reunify with this juvenile; both Respondents have not completed nor attempted to complete their case plans; and both Respondents have not complied with existing Orders of the Court.

It is clear from this finding, along with a rest, that the trial court's reasoning led to the adjudication of neglect for both juveniles. Since the evidence strongly supports the trial court's conclusion of neglect, we hold the trial court's failure to delineate between abuse and neglect to be harmless. *See generally In re Bluebird*, 105 N.C. App. 42, 51, 411 S.E.2d 820, 825 (1992) ("The more efficient and prudent practice for trial courts is to delineate the specific grounds for termination in parental rights cases. Nonetheless, because the evidence strongly supports the trial court's conclusion, we find the error to be harmless.").

Therefore, the trial court did not err by terminating Respondents' parental rights for neglect under N.C. Gen. Stat. § 7B-1111(a)(1).

### D. Best Interests Determination

Respondents contend the trial court abused its discretion in concluding that it was in the best interests of the juveniles to terminate Respondents' parental rights. Specifically, Respondents argue the trial court violated a statutory mandate by proceeding with the juveniles' disposition hearings without the GAL present.

"The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion." *In re C.B.*, 375 N.C. 556, 560, 850 S.E.2d 324, 327 (2020) (citation omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re A.R.A.*, 373 N.C. 190, 199, 835 S.E.2d 417, 423 (2019) (cleaned up). However, "[w]hen an appellant argues the trial court failed to follow a statutory mandate, the error is preserved, and the issue is a question of law and reviewed de novo." *In re S.D.H.*, 296 N.C. App. 392, 399, 908 S.E.2d 868, 876 (2024) (citation omitted).

> A statutory mandate that automatically preserves an issue for appellate review is one that, either: (1) requires a specific act by a trial judge; or (2) leaves no doubt that the legislature intended to place the responsibility on the judge presiding at the trial, or at specific courtroom proceedings that the trial judge has authority to direct.

*In re E.D.*, 372 N.C. 111, 121, 827 S.E.2d 450, 457 (2019) (cleaned up).

Our statutes provide that "after an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating

the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a)

(2025). The factors the trial court must consider and make written findings on those

which are relevant include:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a)(1)–(6). Further, the trial court "may consider any

evidence, including hearsay evidence as defined in G.S. 8C-1, Rule 801, that the court

finds to be relevant, reliable, and necessary to determine the best interests of the

juvenile." *Id.* § 7B-1110(a).

"When in a petition a juvenile is alleged to be abused or neglected, the court

shall appoint a guardian ad litem to represent the juvenile." N.C. Gen. Stat. § 7B-

601(a) (2025). Once appointed, the GAL program is charged with duties, including:

> To make an investigation to determine the facts, the needs of the juvenile, and the available resources within the family and community to meet those needs; to facilitate, when appropriate, the settlement of disputed issues; to offer evidence and examine witnesses at adjudication; to explore options with the court at the dispositional hearing; to conduct follow-up investigations to insure that the

orders of the court are being properly executed; to report to
the court when the needs of the juvenile are not being met;
and to protect and promote the best interests of the juvenile
until formally relieved of the responsibility by the court.

*Id.* § 7B-601(a) (citation modified). "In juvenile cases where a guardian ad litem is required, a trial court cannot properly consider all relevant criteria set out in Section 7B-1110(a) where it wholly lacks evidence from the guardian ad litem for the juveniles." *In re S.D.H.*, 296 N.C. App. at 404, 908 S.E.2d at 878. As the best interests of the juvenile is paramount to these proceedings, "we must presume prejudice where . . . a child was not represented by a guardian *ad litem* at a critical stage of the termination proceedings." *In re R.A.H.*, 171 N.C. App. 427, 431, 614 S.E.2d 382, 385 (2005).

Respondents claim this appeal is analogous to *In re S.D.H.*, 296 N.C. App. 392, 400, 908 S.E.2d 868, 876. In that case, the trial court appointed an attorney in the dual roles of GAL and attorney advocate. *Id.* at 396, 908 S.E.2d at 873. During the adjudication and disposition phase, the trial court did not receive "testimony, written reports, or recommendations from the Guardian ad Litem, aside from argument in his capacity as attorney advocate." *Id.* No new evidence was presented during the disposition phase, and the petitioner's counsel asked the trial court to accept the evidence previously presented during adjudication. *Id.* at 397, 908 S.E.2d at 874.

On appeal, the respondent argued the trial court erred by ruling on disposition without hearing evidence from the guardian ad litem. *Id.* at 398, 908 S.E.2d at 875.

This Court agreed, holding the trial court abused its discretion by "ruling on disposition without necessary evidence from the Guardian ad Litem concerning the best interests of the Juveniles." *Id.* This Court noted that the record was "devoid of evidence offered by the Guardian ad Litem," showing "no indication that [the GAL] conducted a pretrial investigation or prepared reports to assist the trial court in understanding the Juveniles' family dynamics or determining what was in their best interest." *Id.* at 403, 908 S.E.2d at 878.

However, unlike *In re S.D.H.*, the record does not lack evidence and recommendations from the GAL. This appeal is more like *In re J.H.K.*, 365 N.C. 171, 172, 711 S.E.2d 118, 119 (2011). There, at issue was "whether the Guardian ad Litem (GAL) volunteer is required to be present in the courtroom at a termination of parental rights (TPR) hearing." *Id.* The GAL volunteer and her appointed successor filed multiple reports regarding their "assessment of the parents' compliance with court orders and her recommendations concerning the best interests of the children in light of her ongoing investigation of their case." *Id.* at 177, 711 S.E.2d at 122. Although the GAL was not present during the TPR hearing, the attorney advocate "examined witnesses and introduced into evidence the GAL volunteer's best-interest report." *Id.*

Our Supreme Court held that "a local GAL program 'represents' a juvenile within the meaning of N.C.G.S. §§ 7B-601 and 7B-1108 by performing the duties listed in section 7B-601 and that the nonlawyer GAL volunteer is not required to be

physically present at the TPR hearing." *Id.* at 178, 711 S.E.2d at 122. The Court reasoned that the duties required of the GAL and attorney advocate under sections 7B-601 and 7B-1108 are the duties of the "GAL program set forth in section 7B-601." *Id.* at 175, 711 S.E.2d at 120. After reviewing the reports submitted by the GAL and the representation performed by the attorney advocate, the Court noted the record showed "the GAL program satisfied its out-of-court investigatory duties as well as its in-court representational duties . . . ." *Id.* at 178, 711 S.E.2d at 122.

Here, the record indicates that the trial court was presented with sufficient evidence from the GAL program to make a proper best interests determination pursuant to N.C. Gen. Stat. § 7B-601(a). The trial court took judicial notice of the dispositional hearing court reports provided by the GAL. For Roy, the dispositional report noted Respondents' pending child abuse charges related to this case, their inconsistent visitation, their prior domestic violence history, their previous CPS involvement, and both Respondents' prior positive drug screens. The report recommended, inter alia, for custody of Roy to remain with DSS, and for placement to remain with his foster home. The GAL also reported that Roy "enjoys being in the home of his foster parents." For Rachel, the dispositional report noted Respondents' pending child abuse charges, Respondents' failure to comply with their visitation schedule, including Mother being "not attentive" to Roy while Rachel was sleeping. Rachel's dispositional report recommended, to protect and promote her best interests,

for DSS to have full custody and for placement to remain with her foster home. Rachel's report also included that she was "doing well" in her foster home.

The GAL's statutory duties were performed since the GAL program is to "explore options with the court at the dispositional hearing," and "to report to the court when the needs of the juvenile are not being met." N.C. Gen. Stat. § 7B-601(a). Evidence from the GAL reports provided the trial court with recommended options and no additional reports were needed as the record contains no evidence of the juvenile's needs not being met during their placement at the time. *See* N.C. Gen. Stat. § 7B-601(a) ("The duties of the guardian ad litem program shall be . . . to report to the court when the needs of the juvenile are not being met."). Further, there is no indication from the record that the attorney advocate or trial court required the GAL's assistance to protect the juveniles' best interests. *See In re J.H.K.*, 365 N.C. at 177, 711 S.E.2d at 121 ("Given the role of the attorney advocate to assist the GAL, we cannot agree that the General Assembly intended by the use of the word 'represent' to obligate the volunteer GAL to appear in court during the TPR hearing unless the attorney advocate or the trial court deems the GAL's presence necessary to protect the minor's best interests."). Additionally, as to the attorney advocate fulfilling the GAL program's statutory duties, the record shows the attorney advocate appeared at each TPR hearing, cross-examined witnesses, argued during adjudication, and argued recommendations during the disposition phase regarding the juveniles' best interests.

Therefore, the GAL program as a whole "satisfied its out-of-court investigatory duties as well as its in-court representational duties." *Id.* at 178, 711 S.E.2d at 122 (citation modified). Accordingly, the trial court was able to consider all relevant criteria set out in Section 7B-1110(a) and so the trial court did not abuse its discretion.

## III. Conclusion

The trial court's findings of fact are supported by clear, cogent, and convincing evidence and support the termination of Respondents' parental rights for neglect. And since only one ground enumerated in N.C. Gen. Stat. § 7B-1111(a) is required to uphold a trial court's termination order, we need not consider Respondents' remaining arguments on other grounds. Finally, the trial court did not abuse its discretion by proceeding with each juvenile's disposition hearing without the GAL present.

AFFIRMED.

Judges HAMPSON and GRIFFIN concur.

Report per Rule 30(e).